T.C. Memo. 2008-278

UNITED STATES TAX COURT

ESTATE OF THELMA G. HURFORD, DECEASED, DONOR, G. MICHAEL HURFORD,
INDEPENDENT EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

ESTATE OF THELMA G. HURFORD, DECEASED, G. MICHAEL HURFORD,
INDEPENDENT EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 23954-04, 23964-04.    Filed December 11, 2008.

William A. Roberts and Kyle Coleman, for petitioners.

Nancy B. Herbert, Richard J. Hassebrock, and Gary R. Shuler, for respondent.

CONTENTS

FINDINGS OF FACT ........................................ 3

    A. The Hurford Family ............................... 3
    B. Gary's Death.................................... 6
    C. Thelma's Diagnosis.............................. 11
    D. Garza's Plan................................... 13
    E. Execution of Garza's Plan - Phase I.............. 16
        1. Transfers to HI-1........................... 19
        2. Transfers to HI-2........................... 25
        3. Transfers to HI-3........................... 27
    F. Execution of Garza's Plan - Phase II............. 28
        1. Value of the FLP Property................... 28
            a. HI-1's Value......................... 29
            b. HI-2's Value......................... 30
            c. HI-3's Value......................... 31
            d. Discounts........................... 31
        2. Creation of the Private Annuity............. 33
        3. How the Hurford Private Annuity Worked....... 34
    G. Thelma Hurford's Death and Tax Returns.......... 36
    H. Estate and Gift Tax Returns' Audit.............. 43

OPINION ................................................ 45

I. What is Includable in Thelma's Estate?................ 45

    A. Positions of the Parties......................... 47
    B. The Private Annuity and the FLPs................. 48
        1. Was the Private Annuity Effective to Remove
           Assets from Thelma's Estate?................. 52
            a. Was the Transfer of Thelma's Interest in
              the FLPs for the Private Annuity *Bona Fide*
              and for Adequate and Full Consideration?. 52
            b. Did Thelma Retain a Prohibited Interest
              in the Property She Transferred to Her
              Children through the Private Annuity?... 58
        2. Were the FLPs Valid?........................ 61
            a. Was the Creation of the FLPs *Bona Fide* and
              for Adequate and Full Consideration?..... 61
            b. Did Thelma Retain the Possession or
               Enjoyment of, or the Right to the Income
               From, the Property She Transferred to the
               FLPs in Violation of Section 2036 (a)(1)?. 72
    C. The Family and Marital Trusts................... 75
    D. Gifts Thelma Made in February 2000.............. 78

II. Attorney's Fees..................... .................. 78

III. Negligence.......................................... 80

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  It is a truth universally acknowledged, that a recently widowed woman in possession of a good fortune must be in want of an estate planner.

Thelma Hurford had devoted her life to family and friends, leaving the management of the finances to her husband Gary.  When he died suddenly, she had to learn what they owned and decide what to do with it.  While she struggled with this burden, she was herself stricken with cancer and so had to arrange the accelerated planning of her own estate.  Two attorneys vied for her attention and she chose Joe B. Garza.

She lost her life to the cancer.  We must now decide how much of her estate will be lost to taxes.

FINDINGS OF FACT

A.  <u>The Hurford Family</u>

Gary T. Hurford was born in West Texas in unpromising circumstances and went at a young age to work on oil rigs.  There he met a petroleum engineer whose clean clothes and new car suggested to young Gary that education might lead to a better life.  He soon gave up roughnecking and enrolled at the University of Texas.  He discovered there that he had an aptitude for engineering, and after graduation he was hired by the Hunt

Oil Company. He rose steadily and after 25 years became the company's first president not named Hunt. He prospered and grew rich.

Thelma also came from a modest background, the daughter of immigrants. She was an elementary school teacher when she met Gary and they soon wed. In due course, she became a mother and devoted herself to working inside the home.

Much of this work lay in rearing three children; all of whom are now married with children of their own. The oldest is Gary Michael Hurford, known as Michael. Michael grew up in Texas, went to the University of Texas at Austin, and then to medical school in San Antonio. He became a psychiatrist and practices in Kentucky, where he also was a resident when the petition was filed.

David T. Hurford is the middle child. David graduated from Southwest Texas State University, but has struggled with difficult personal problems, some of them severe, for much of his life. His parents and his siblings acknowledged this and have tried to protect him, particularly in his finances. While his parents were alive, David stayed close by and worked for many years on one of his dad's ranches--raising and selling cattle, fixing fences, and cutting and baling hay.

The youngest Hurford is Michelle Hurford McCandless. Michelle also graduated from the University of Texas at Austin,

and she worked in advertising until October of 1997, when Gary hired her to help with the family's bookkeeping--especially the preparation of the payroll for the employees whom Gary hired to work on the farms and ranches that he had bought over the years. Michelle also kept the books for all her parents' investments and bank accounts.

Michelle, out of duty and habit, took notes on nearly every meeting she attended and every phone call she listened to that involved Gary's and Thelma's estates. She would also meticulously list the questions that she planned to ask during those meetings and calls. It appears that she learned these habits from her mother, who also kept in her own planner detailed notes of seemingly every meeting she had. Michelle saved all these notes and turned them over to the Commissioner during discovery. We view Michelle's action as a strong indicator of her honesty and have used these notes extensively to reconstruct what happened after Gary died.

But we use them with some caution. They show a general lack of understanding--even some confusion--about the tax and estate-planning concepts at issue in this case. This is entirely understandable, since neither Michelle nor her mother had an education in law or accounting. But the confusion of Michelle and her siblings about these concepts, though it may have been rooted in their inherent difficulty, was surely compounded by the

barrage of professional advice they both sought and had directed against them.

B.    Gary's Death

On April 8, 1999, Gary died.  He and Thelma had amassed a considerable fortune as listed on Gary's estate tax return:[1]

| | |
|---|---|
| Real estate | $2,020,800 |
| Stocks and bonds | 2,096,314 |
| Mortgages, notes, and cash | 934,413 |
| Life insurance | 2,300,000 |
| Miscellaneous property | 1,342,880 |
| Hunt oil phantom stock | 5,552,377 |
| Total | 14,246,784 |

The real estate included farms and ranches, as well as two houses:  their primary home in Arlington, Texas; and a second home in Tyler that was closer to their agricultural property.  This agricultural property amounted to about 2000 acres divided into 11 or 15 parcels--those records only sometimes combine those parcels that were contiguous.

The stocks and bonds and other liquid investments were strewn among many different accounts at several banks.  A large chunk was in options to buy stock in Nabors Corporation Services, Inc., which Gary had earned by serving on the Nabors board of directors.  Another large chunk (by far the largest piece of the

_____

[1]  Texas is a community-property state, and these numbers reflect their total wealth, not just Gary's interest.

miscellaneous property listed above) was $1.26 million in Gary's Hunt Oil retirement plan, which Thelma rolled over to an IRA in her name after his death.

But the single biggest asset in Gary and Thelma's estate was no ordinary security or retirement plan, but something called Hunt Oil phantom stock. This phantom stock is not actually stock, but instead a form of deferred compensation that Hunt Oil gave to employees--letting them share in the company's growth without the Hunt family's having to dilute their own equity. Each "share" of phantom stock was valued at approximately the price of a share of Hunt Oil common stock, as fixed by Hunt Oil each year on December 31. The dollar amount reported on Gary's estate tax return was its value on December 31, 1998.

Gary received more from Hunt Oil than just compensation in these varied forms. Among the perks important to this case were tax-preparation and estate-planning services. While Gary was working, Hunt Oil paid KPMG to prepare his tax returns; and Gary retained Santo "Sandy" Bisignano, formerly a partner in the respected Texas law firm of Johnson & Gibbs, to plan his and Thelma's estates. The troubles that later entangled the Hurfords had their roots in the wills that Bisignano had drafted for them in 1993. These wills were mirror images of each other and took a conservative approach to estate planning. This was Gary's choice--Bisignano had suggested slightly more aggressive

techniques such as irrevocable life insurance trusts (ILITs), grantor-retained annuity trusts (GRATs), and family limited partnerships (FLPs).[2] Gary instead chose to divide most of his estate into two trusts--a bypass trust and a qualified terminable interest property (QTIP) trust. According to the Hurfords' wills, the property of whichever spouse died first would go into the two trusts, with the exception of the Arlington home and any personal effects, which would pass directly to the surviving spouse.

The first trust set up in Gary's will was a bypass trust, called the "Family Trust." It was funded with $650,000, the estate-tax-credit equivalent amount.[3] The Family Trust's

---

[2] An ILIT may remove life insurance proceeds from a decedent's estate by transferring ownership of the policy to a trust. Bittker, et al., Federal Estate and Gift Taxation 371 (9th ed. 2005).

A GRAT is a tax-saving device in which a grantor transfers assets into trust and retains an annuity payable for a specified term. If the grantor survives the term and the assets enjoy a higher rate of return than specified in tables prescribed by the IRS, the "extra" appreciation passes to the trust's beneficiaries without incurring gift or estate tax. Id. at 80-81.

A FLP allows members of a family to transfer partnership interests to one another at a discount (usually claimed for lack of marketability and lack of control), which may reduce the tax that they might otherwise owe on the transaction. Id. at 136-37, 600-02.

[3] This is the amount that could pass estate-tax free (thus the description "bypass trust") to nonspouse beneficiaries in 1999. Thelma's access to its assets was limited, but any money remaining in the trust would not be taxed at her death.

immediate purpose was to provide for the education, health, maintenance, or support of Thelma, their children, and Gary's mother. But its ultimate purpose was to shield from taxation at Thelma's death the original corpus of $650,000 (or whatever was left after distributions).

The rest of Gary's estate went into a second trust called the "Marital Trust." Income from the Marital Trust was to be paid to Thelma. And the principal was also available to her for her education, health, maintenance, and support.

Gary's will appointed Thelma executor of his estate and trustee of both the Family and Marital Trusts. Managing Gary's estate as well as her half of the marital property was a challenge for Thelma because Gary had long tended their finances alone. Thelma's children were similarly unfamiliar with how to manage such a large estate, so they banded together and sought the advice of several professionals. Advice from Bisignano and KPMG was no longer free, because Hunt Oil stopped paying their bills after Gary died. But Bisignano and KPMG at first remained members of the Hurfords' team, and it was at Bisignano's suggestion that they hired Chase Bank of Texas, N.A., to provide investment advice.

Bisignano outlined for Thelma a plan to settle Gary's estate. The first step was probating Gary's will, which Bisignano quickly began by April 15, 1999. He then moved on to

identifying and valuing the assets. This ended up taking a while, but Bisignano credibly testified that his progress was protracted by design, lest an inaccurate valuation of those assets undermine his effort to accurately calculate--before he prepared the tax return for Gary's estate--whether a QTIP election was more valuable to Thelma than a credit for prior transfers.[4]

As spring turned to summer in 1999, Thelma sought Bisignano's advice on her own estate plan. Bisignano again took a conservative and thoughtful approach, recommending that she first make $225,000 gifts to Michael, David, and Michelle. The total of $675,000 in gifts equaled the gift-tax exemption amount.[5] She decided to make these gifts in February 2000. He

---

[4] Property passing from a deceased husband to his surviving wife generally is deductible from his gross estate. Sec. 2056(a). But this deduction does not include property--for example, a life estate with remainder to children--in which the surviving spouse has an interest that could fail due to the lapse of time or some other contingency. Sec. 2056(b)(1). Section 2056(b)(7)(A) creates an exception to this exception for qualified terminable interest property, treating it deductible at the first spouse's death, but includable in the surviving spouse's estate. (The section references in this note and throughout the opinion are to the Internal Revenue Code. Any Rule references are to the Tax Court's Rules of Practice and Procedure.)

[5] Federal gift and estate-tax law allows a credit which a person can use either to reduce the tax on gifts made while the donor is alive (under sections 2505(a) and 2503(b)(2)) or against the estate tax imposed at death (under section 2010(c)). Thelma used the credit amount available during 2000, which was $25,000 higher than the credit available to her husband in 1999, when his
(continued...)

also recommended that she create a family limited partnership (FLP) into which she could transfer the farm and ranch properties, unifying the land management within a single entity, perhaps with the plausible purpose of reducing the risk of liability from what were then actual operating businesses. Bisignano later recommended a second FLP to hold Thelma's own financial assets. In August, Thelma also rolled Gary's retirement assets into an IRA in her own name.

Thelma, however, had little desire to run the farms and ranches herself, so Bisignano began drafting leases for those properties, starting with a parcel in Navarro County, and then moving on to all the properties in Dallas and Ellis counties. And though Thelma continued to employ her son David to work on a ranch in Anderson County until the end of January 2000, even her direct involvement in that business ended when David received his $225,000 gift, which included a one-year lease for 754 acres.[6]

C.    Thelma's Diagnosis

At the beginning of 2000, Thelma began feeling back pain, which became so severe that on January 23 she went to an

_____

[5](...continued)
death led to the creation of the $650,000 Family Trust.

[6] Michael got his $225,000 in cash. David got $133,134 in cash and $91,866 in farm equipment, cattle, and leases. And Michelle got $177,386 in cash and the cancellation of a loan in the amount of $47,164. Thelma also made eight $10,000 cash gifts in 2000 to her sisters, children, and daughters- and son-in-law.

emergency room.  The diagnosis was cancer, and Thelma decided to have surgery in February 2000.

Her surgeon classified her disease as being already at stage three because it had already spread beyond its initial site to the surface of her liver.  Surgery could not cure the disease, but it did succeed in reducing the cancer's size, and Thelma began chemotherapy immediately.

Near the end of January 2000, Bisignano had begun to move forward with Thelma's estate plan.  He started drafting documents to create two FLPs, one for the farm and ranch properties and another for Thelma's cash and investment assets.  But by early February, while Bisignano was still working on the FLPs, Michael was already looking for a new attorney.  Thelma had become dissatisfied with Bisignano, because (according to Michael) he did not relate well to the family and would often speak over their heads.  Thelma was also concerned that he was not completing Gary's estate tax return or her own estate plan quickly enough and worried that he was too expensive.  Michael volunteered to take the lead in trying to find a replacement for Bisignano, but living in Louisville made this mission difficult and he turned to his brother-in-law, an orthopedic surgeon living near Houston, for advice.

This brother-in-law recommended Joe Garza.  Michael and Michelle spoke with him, asking Garza to critique Bisignano's

proposed estate plan and make suggestions on what he would do differently.  Their infatuation with Garza was understandable.  We observed Bisignano to be reserved and fastidious, and proud of the high quality of his work, but with a manner that on first appearance is perhaps not the most inviting.  Garza, in contrast, is a model of the amiable and pleasing man; and his debut in the notes of Thelma's meetings with him show that she thought him one of the most agreeable men (or, at least, lawyers) that she had ever met.  Garza swiftly persuaded Thelma that his estate plan was better for her than Bisignano's and she hired him on February 22, 2000.  Thelma dismissed Bisignano the very next day.

D.  Garza's Plan

According to Garza, a "brilliant estate-planning strategy" is one "that saves estate tax."  His plan was to separate Thelma's, the Marital Trust's, and the Family Trust's assets into three groups:  (1) cash, stocks, and bonds; (2) the Hunt Oil phantom stock; and (3) the farm and ranch properties.  Then he created three FLPs, one to receive each group of assets, giving an interest in each to Thelma, Gary's estate, Michael, David, and Michelle.  Finally, Garza directed Thelma to sell her and Gary's estate's interests in each FLP to Michael, David, and Michelle through a private annuity agreement.

To understand Garza's plan, we need to step back and explain a bit about FLPs and private annuities.  A FLP uses two entities:

a limited partnership and either a limited liability company (LLC) or a trust.  The LLC or trust serves as the general partner of the limited partnership and thereby assumes any extraordinary liabilities associated with the property owned by the partnership.  The limited partners of the partnership are typically family members who contribute something of value, either in goods or in services, to the partnership in exchange for their ownership share.  Once the partnership interests are created, they are quickly rearranged by gift or will.

The first obstacle that an aggressive planner meets is the Code's insistence that property transferred either by will or by gift must be taxed at its fair market value.  See secs. 2031, 2032, 2512 and 25.2512-1, Gift Tax Regs.  A planner using a FLP has to make sure that it is not the assets in the partnership that are being transferred among family members, but only interests in the partnership itself.  This is important because due to factors such as lack of marketability and control, a partner's interest in the partnership often has a lower fair market value than the same partner's pro rata share of the assets' own fair market value.  See Holman v. Commissioner, 130 T.C. 12, 14, 19 (2008); Senda v. Commissioner, T.C. Memo. 2004-160 (imposing a gift tax on the value of stock contributed to a partnership rather than the transferred partnership interests where partnership formalities were not respected), affd. 433 F.3d

1044 (8th Cir. 2006).  This would seem unusual--normal people typically don't try to reduce the value of their hard-earned wealth.[7]

Like FLPs, private annuities are another common estate-planning tool.  A private annuity is a transfer of property from one person to another in exchange for a promise to make periodic payments.  These payments can last for the rest of the transferor's life, and the IRS allows drafters of private annuities to calculate the transferor's life expectancy using government-published actuarial tables.  In theory, the value of the periodic-payment stream equals the value of the transferred property, so the private annuity removes the transferred property from the transferor's estate and gives the transferee any appreciation in the transferred property's value.  The usually unspoken usefulness of this device is greatest when those arranging it know more about the particulars of their situation

---

[7] Courts, including the circuit court to which this case may be appealable, have nevertheless recognized that such a reduction in immediately realizable fair market value might be sensible for a rational actor willing to pay for the benefits of management expertise, preservation of assets, and avoidance of personal liability.  Estate of Kimbell, 371 F.3d at 257, 266.  And such calculations may also be seen in earlier forms of intergenerational wealth transfer.  See Völsunga Saga: the Story of the Volsungs and Niblungs 5-8, 11-12, 36-39, 50-51, 59, 64-67 (H. Halliday Sparling ed., Eirikr Magnusson & William Morris trans., Walter Scott Publg. Co., Ltd. 1888) (bequeathing shards of sword to heir who reforges them into new sword after waiting period, noting "Fain would we keep all our wealth till that day of days").

than is reflected in the actuarial tables or--to be blunt--when children think their parent won't survive for very long. Anticipating this, the Secretary has long had regulations restricting use of the actuarial tables in cases of terminal illness.[8]

E.    Execution of Garza's Plan - Phase I

Garza got to work setting up the FLPs immediately after he was hired.  He first organized three limited partnerships and three LLCs.  He named the LLCs Hurford Management No. 1, LLC (HM-1);  Hurford Management No. 2, LLC (HM-2); and Hurford Management No. 3, LLC (HM-3).  For each LLC he filed a certificate of organization and articles of organization with the secretary of state of Texas on February 24, 2000.  He then prepared stock certificates, regulations, employment agreements, and minutes of the organizational meetings.  Each of the Hurfords received a one-fourth interest in each LLC.  The Hurfords held an organizational meeting for each of the LLCs and elected Thelma president, Michelle secretary and treasurer, and Michael and David vice presidents.  According to the employment agreements, each of the Hurfords was to receive compensation for serving as

---

[8] The regulations define terminal illness to be an "incurable illness or other deteriorating physical condition" with at least a fifty-percent chance of death within a year.  See sec. 1.7520-3(b)(3), Income Tax Regs.  In such cases, the parties to a private annuity must use the transferor's actual life expectancy to calculate payments.  Sec. 1.7520-3(b)(4), Example, Income Tax Regs.

an officer, but these agreements were never signed or used.  And no one signed the stock certificates, regulations, or organizational minutes either.

To form the limited partnerships, Garza filed certificates of limited partnership with the Texas secretary of state on February 24, 2000.  He named these limited partnerships Hurford Investments No. 1, LTD. (HI-1); Hurford Investments No. 2, LTD. (HI-2); and Hurford Investments No. 3, LTD (HI-3).  On each certificate, Garza named as general partner the LLC whose name corresponded to the name of the partnership, e.g., HM-1 and HI-1. Garza completed organizing the FLPs on March 20, 2000, by having the Hurfords sign agreements of limited partnership.  These agreements show an unsteady drafting ability to even an untrained eye--a table of contents pointing to incorrect page numbers, a grant of a limited-partnership interest to the "Gary T. Hurford Trust" when no such trust existed at the time, and signature pages showing HM-1 as the general partner of all three partnerships.

We find, however, that Garza at least intended to use the same organizational structure for each of the FLPs, as shown by the following diagram where x = 1, 2, or 3:



An unusual feature of Garza's plan was that he created the
limited partnership interests before the partnerships were

funded. He testified that he did this to avoid gift taxes when Michael, David, and Michelle received their 1-percent interests. Garza reasoned that by creating the partnership interests first, each partner would start with a zero balance in his capital account and each capital account would remain at zero until that partner made a contribution. So when Thelma and Gary's estate funded the partnership, their capital accounts were to have increased by the amount each contributed. Conversely, Michael, David, and Michelle did not contribute anything to the partnerships, so they held a 1-percent interest in each partnership but had capital account balances of zero.

1.   Transfers to HI-1

The Hurfords created HI-1 to receive stock and cash assets from Thelma, the Marital Trust, and the Family Trust. To move these assets into HI-1, Thelma signed an undated letter drafted by Garza. Garza based this letter on a form that he used to fund the FLPs, but he didn't customize it beyond the names of the accounts and the people and entities involved. In the letter, Thelma asked Chase to "transfer my above-referenced account with you into the name of the Limited Partnership." The accounts that she listed were the Thelma G. Hurford Investment Management Agency (THIMA), the Marital Trust, and Family Trust accounts. Thelma also requested that Chase give herself, Michael, David, and Michelle "signatory and withdrawal authority" on the HI-1

account.  At the end of March 2000, Thelma acting in her capacity as president of HM-1, signed an agreement with Chase to open the accounts necessary to complete the transfers.

Chase then opened three accounts for HI-1, using the same names as the old accounts except that each was preceded by HI-1, e.g., HI-1 THIMA.  Over the next three months, assets flowed into the H-1 THIMA account:[9]

| Table 1: Transfers from THIMA to HI-1 THIMA | | | |
|---|---|---|---|
| Date | Amount | Originating Acct | Destination Acct |
| 4/12/00 | $3,447,466 stocks | THIMA | HI-1 THIMA |
| 4/13/00 | $ 471,949 cash | THIMA | HI-1 THIMA |
| 5/01/00 | $ (274,417)cash | HI-1 THIMA | THIMA ("to close out") |
| 6/27/00 | $ 273,275 stocks | THIMA | HI-1 THIMA |
| 7/31/00 | $ 88,683 cash from house sale | THIMA | HI-1 THIMA |
| 7/31/00 | $ 1,561 cash | THIMA | HI-1 THIMA |
| 10/2/00 | $ 351 cash | THIMA | HI-1 THIMA |
| 1/31/01 | $ 1 cash | THIMA ("final distribution") | HI-1 THIMA |
| **Total** | **$3,720,741 stocks** **$ 288,127 cash** | **THIMA** | **HI-1 THIMA** |

Thelma also set to work transferring the trusts' assets to the new HI-1 accounts:

_____

[9] Tables 1 through 7, *infra*, shows the tax cost of the stocks and bonds, not their fair market value on the transfer date.  The parties did not remedy this peculiarity of Chase's recordkeeping with summaries of the market price of those securities on dates relevant to the case--for example, their value on the date Thelma signed the private annuity, or the dates when payments under the annuity were made to her using those securities.

| Table 2: Transfers from the Marital Trust to HI-1 MT | | | |
|---|---|---|---|
| **Date** | **Amount** | **Originating Acct** | **Destination Acct** |
| 4/12/00 | $ 447,179 stocks | MT | HI-1 MT |
| 4/13/00 | $ 72,276 cash | MT | HI-1 MT |
| 5/01/00 | $ (1,198)cash | HI-1 MT | MT ("to close out") |
| 6/27/00 | $ 90 cash | MT | HI-1 MT |
| 9/08/00 | $ 1 cash | MT | HI-1 MT |
| **Total** | **$ 447,179 stocks**<br>**$ 71,169 cash** | **MT** | **HI-1 MT** |

| Table 3: Transfers from the Family Trust to HI-1 FT | | | |
|---|---|---|---|
| **Date** | **Amount** | **Originating Acct** | **Destination Acct** |
| 4/12/00 | $ 570,050 stocks | FT | HI-1 FT |
| 4/13/00 | $ 99,877 cash | FT | HI-1 FT |
| 5/01/00 | $ (6,098)cash | HI-1 FT | FT ("to close out") |
| 6/27/00 | $ 124 cash | FT | HI-1 FT |
| 10/2/00 | $ 1 cash | FT | HI-1 FT |
| **Total** | **$ 570,050 stocks**<br>**$ 93,904 cash** | **FT** | **HI-1 FT** |

In late November or early December 2000, Thelma told Chase to transfer over $1 million from the Gary Hurford estate account to HI-1. Thelma's letter, however, did not specify into which HI-1 account Chase should transfer the funds. Chase acknowledged Thelma's request in a December 8, 2000, fax that asked her to sign an investment management agreement to complete the transfer.

After she signed the agreement, Chase transferred the assets into a new account named "Thelma G. Hurford, Executrix of The Estate of Gary T. Hurford, Deceased #1." In February 2001, Chase emptied this new estate account into the THIMA HI-1 account. Thelma requested a liquidation of her IRA on December 28, 2000, and asked that Chase transfer the funds from her IRA to HI-1. Chase completed most of that transaction on December 28 and 29, 2000. These various transfers can be understood better in tabular form:

| Table 4: Transfers from GTH Estate Acct to GTH Estate Acct #1 | | | |
|---|---|---|---|
| **Date** | **Amount** | **Originating Acct** | **Destination Acct** |
| 12/29/00 | $1,077,934 stocks | GTH Estate | GTH Estate #1 |
| 1/03/01 | $ 4,364 cash | GTH Estate | GTH Estate #1 |
| **Total** | **$1,077,934 stocks $ 4,364 cash** | **GTH Estate** | **GTH Estate #1** |

| Table 5: Transfers from TGH's IRA to HI-1 THIMA | | | |
|---|---|---|---|
| **Date** | **Amount** | **Originating Acct** | **Destination Acct** |
| 12/28/00 | $ 56,063 cash | TGH's IRA | HI-1 THIMA |
| 12/29/00 | $1,092,954 stocks | TGH's IRA | HI-1 THIMA |
| 3/15/01 | $ 453 cash | TGH's IRA | HI-1 THIMA |
| **Total** | **$1,092,954 stocks $ 56,516 cash** | **TGH's IRA** | **HI-1 THIMA** |

Then in February 2001, Chase moved most of the assets in the HI-1 MT, HI-1 FT, and Thelma G. Hurford, Executrix of The Estate of Gary T. Hurford, Deceased #1 accounts into the HI-1 THIMA account. On the form Chase prepared to complete the transfer it

listed Thelma as the "Primary Client" and/or "Beneficiary" for the HI-1 MT account.

These last transfers are summarized in this table:

| Table 6: Transfers from HI-1 MT, HI-1 FT, and GTH Estate Acct #1 to HI-1 THIMA | | | |
|---|---|---|---|
| **Date** | **Amount** | **Originating Acct** | **Destination Acct** |
| 2/07/01 | $      4,574 cash | HI-1 MT | HI-1 THIMA |
| 2/26/01 | $    126,534 bonds | HI-1 MT | HI-1 THIMA |
| 2/27/01 | $      1,178 cash | HI-1 MT | HI-1 THIMA |
| 3/02/01 | $          5 cash | HI-1 MT | HI-1 THIMA |
| 3/15/01 | $    428,763 stocks | HI-1 MT | HI-1 THIMA |
| **Total from HI-1 MT** | **$    428,763 stocks**<br>**$    126,534 bonds**<br>**$      5,757 cash** | **HI-1 MT** | **HI-1 THIMA** |
| 2/07/01 | $     10,873 cash | HI-1 FT | HI-1 THIMA |
| 2/26/01 | $    151,636 bonds | HI-1 FT | HI-1 THIMA |
| 2/27/01 | $      1,164 cash | HI-1 FT | HI-1 THIMA |
| 3/02/01 | $          9 cash | HI-1 FT | HI-1 THIMA |
| 3/15/01 | $    565,594 stocks | HI-1 FT | HI-1 THIMA |
| **Total from HI-1 FT** | **$    565,594 stocks**<br>**$    151,636 bonds**<br>**$     12,046 cash** | **HI-1 FT** | **HI-1 THIMA** |
| 2/26/01 | $1,077,934 stocks | GTH Estate Acct #1 | HI-1 THIMA |
| 3/02/01 | $         20 cash | GTH Estate Acct #1 | HI-1 THIMA |
| 3/15/01 | $        225 cash | GTH Estate Acct #1 | HI-1 THIMA |
| 4/06/01 | $         63 cash | GTH Estate Acct #1 | HI-1 THIMA |
| 4/09/01 | $         28 cash | GTH Estate Acct #1 | HI-1 THIMA |
| **Total from GTH Estate Acct #1** | **$1,077,934 stocks**<br>**$        336 cash** | **GTH Estate Acct #1** | **HI-1 THIMA** |

The entire series of transfers is summed up in this diagram:

**HI-1 Transfers**



The Hurfords acknowledge that there were problems with the Chase HI-1 accounts. The biggest was that throughout the year before she died, Thelma remained the sole signatory on many of these accounts, and kept pouring money and assets into them even after they had supposedly been used to pay for the private annuity. The Hurford children claim that they tried on numerous occasions to have Thelma's name removed from the HI-1 accounts, but were always unsuccessful. Another serious problem was that not all the transfers were deposits. On April 14, 2000, just days after she started moving money into the HI-1 accounts, Thelma had Chase transfer $65,000 from "my Limited Partnership #1 (TH) account to the personal Chase [checking account]." Then a few days later, she had Chase transfer $25,000 from "my Limited Partnership #1 Account" to "my Bank of America checking account." Michelle credibly explained that Thelma signed these transfers because Chase was confused about who had authority under these accounts, and that Thelma needed the money to make an estimated tax payment. There is no evidence that any of this backwash of money benefited the HI-1 partnership itself in any way.

2. <u>Transfers to HI-2</u>

The Hurfords created HI-2 to receive the Hunt Oil phantom stock. Garza prepared another of his form letters to notify Hunt Oil that Thelma wanted the phantom stock moved to HI-2. Richard Massman, Hunt's transfer agent for the stock as well as its vice

president and general counsel, received the letter on March 24, 2000, and quickly sent Thelma a list of documents that he needed before he would okay the transfer:

1. Letters testamentary identifying Thelma as executrix;

2. An excerpt from Gary's will identifying her as the beneficiary;

3. Documentation showing that the phantom stock was transferred from Gary's estate to Thelma; and

4. An assignment from Thelma to HI-2.

Garza faxed Massman the letters testamentary in May, but then let things slide--neither the Hurfords nor Garza communicated with Massman again until that fall. On October 20, 2000, Michael called Massman to discuss the transfer of the phantom stock, and Massman became concerned about Thelma's multiple roles as beneficiary, executrix, and trustee. To allay these concerns, he asked Thelma for a letter stating that Thelma was approving the transfer under all three roles. As Massman himself credibly put it, "we kind of operate on the bomb-throwing grandchild principle"--meaning that he wanted to protect Hunt Oil from any competing claims to the phantom stock.

This prompted Garza to send Massman an indemnity letter on November 18, 2000, but this letter was as sloppy as the other paperwork he'd prepared, including a space on a signature line for "Daniel" instead of David. Massman is a meticulous man, and

he wanted the letter corrected.  But it took Garza almost two months to fix his mistakes.  The second letter satisfied Massman, though, and on January 15, 2001, Massman responded with his own letter stating that Hunt Oil recognized HI-2 as the owner of the phantom stock.  Even though Hunt did not receive all the necessary documents until January 2001, it reported in its internal records that the transfer occurred on March 22, 2000, the day Thelma sent the first letter requesting the transfer.

3.  <u>Transfers to HI-3</u>

The Hurfords created HI-3 to receive the real property (except for the houses in Arlington and Tyler) held by Thelma, the Marital Trust, and the Family Trust.  To complete this chore, Garza prepared twenty deeds for Thelma to sign.  Why twenty?  We're not sure.  We could not figure out by examining the deeds how eleven parcels (or fifteen, if a couple contiguous properties were divided) had multiplied into twenty.  There was also another patent problem with the deeds.  Garza had drafted each deed so that it conveyed the property to "Hurford No. 3, Ltd." not "Hurford Investments No. 3, LTD."  Garza filed the deeds with the counties on March 23, 2000.  But even twenty deeds were not enough:  Garza failed to prepare a deed for a parcel that was in both Ellis and Dallas Counties.  Garza waited until April 10, 2002, and then mistakenly deeded this parcel to "Hurford No. 3, Ltd." too.

Thelma Hurford herself maintained the insurance policy on the farm and ranch properties now lying (maybe) in HI-3.  The Commissioner suggests that Thelma was paying for that insurance, but the record is not clear.  We do find that she had a friendly relationship with the insurance agent and spoke with him about renewing the policy in July 2000.  We also find that Thelma's and Michelle's names remained on the Bank of America Farm Account until December 2000, when the account's name was finally changed to "Hurford #3 DBA Hurford Farms."

F.   Execution of Garza's Plan - Phase II

Michael and Michelle took the next step in Garza's estate plan and entered into a private annuity with Thelma on April 5, 2000, a bit more than two weeks after the FLPs had been formed, but a week before even the first transfers of property from Thelma and the Trusts to the FLPs.  Through this agreement, Thelma purported to sell Michael and Michelle a 96.25-percent interest in HI-1, HI-2, and HI-3 for a "fixed annual income for the rest of her life."  David did not sign the private annuity and the extent of his obligations under the agreement is a problem we discuss below. See *infra,* p. 53.

1.   Value of the FLP Property

One key to creating a private annuity capable of withstanding audit is valuing the assets being sold so that the amount of the annuity is accurate.  The values Garza used in his

calculations appear in two nearly identical unsigned letters that he wrote on April 4, 2000.  The first two sections of both letters are the same.  In those sections, Garza listed the total values for the assets in each FLP.  He then calculated the value of Thelma's interest in each partnership by multiplying the total value of the FLP by 96.25 percent.  The third section is where the letters diverge.  In that section, Garza calculated the discounted value of Thelma's interest in each FLP by multiplying the value of that interest by a discount factor, and then summing them to get a "Grand Total Figure."  In one of the letters, however, he used lower discount factors and included Thelma's IRA in the "Grand Total Figure."  The "Grand Total Figure" on this letter was not correct due to an arithmetic error.

     a.   HI-1's Value

In his April 4 letters, Garza separated HI-1's assets into two classes.  He reported that the stocks and bonds were worth $2,115,740 and that the mortgage notes and cash were valued at $1,134,593.  We don't know where Garza got these numbers--while they are close to those on Gary's estate tax return, they differ by about $200,000.  They are also significantly lower than the minimum of more than $5.5 million that the Hurfords agree was transferred into HI-1.[10]  And they in no way take into account

---

[10] During the course of litigation, the estate hired an appraiser to determine the fair market value of the FLP interests

(continued...)

the changes in the composition of Gary's and Thelma's assets in the year after he died. Assets in several accounts were moved to Chase, where normal trading further reduced the similarity of the Hurfords' portfolio transferred to the FLPs and their portfolio at the date of Gary's death.

      b.    <u>HI-2's Value</u>

In his April 4 letters, Garza valued the phantom stock at $5,552,377. That is the same value that he reported on Gary's estate tax return. It comes from a letter that Massman had sent Bisignano in May 1999 that included an estimated value for the phantom stock as of December 31, 1998. Garza testified that he used this value because it was the "most current information that we had" and "it didn't appear to me that the value was increasing very much." But we know that the December 1998 value was already out-of-date because Hunt Oil recalculated phantom-stock values at the end of each calendar year. And we specifically find that the value of the phantom stock was increasing. In February 2000, Massman met with a Chase employee to discuss the phantom-stock plan and during that meeting he estimated that the phantom stock was already worth $6.4 million, which we now find was its value

---

[10](...continued)
after applying discounts. The appraiser's letter listed the value of assets contributed from Thelma and the "Gary T. Hurford Trust" to the partnerships. The appraiser determined the stated value of HI-1's cash, stocks, bonds and mortgage notes was $5,524,641 as of March 20, 2000.

when the FLPs were formed--as even the estate's expert witness conceded.

### c. HI-3's Value

In his April 4 letters, Garza listed the value of HI-3 as $2,020,800. This was again based on the same valuation used to report real estate values on Gary's estate tax return. But using the number from the return was wrong. Those real-estate values came from an appraisal that Bisignano had prepared and reflect the properties' values on April 12, 1999, the day Gary died, and Garza made no effort to consider any change in their values in the year that had passed. The $2,020,800 reported on Gary's estate tax return also included the Arlington and Tyler houses, and the Ellis/Dallas county property, none of which was actually transferred to HI-3. This necessarily caused a misstatement of the value of the property that Garza was trying to move out of Thelma's own estate.

### d. Discounts

The method that Garza used to pick the discount factors to apply to the FLP interests was similarly haphazard. We know from Michelle's notes that Garza bragged that he had "experience obtaining 50 percent discounts in settlements on estates with IRS, and also [he] had coached a lawyer in Mississippi in a valuation battle with IRS, and he got a 50 percent discount."

But Garza chose not to go for these maximum discounts with the Hurfords.  Instead, he contacted several valuation appraisers.

Garza sent a letter to one of these appraisers on March 8, 2000, asking him to call and tell him his "general approach, estimate of discount, and proposed fees."  After their discussion, Garza noted in Thelma's file that the appraisals would cost $6,500 and that "[h]is discount for the marketable securities would be 32-36 [percent,] for Phantom stock, 36-44 [percent,] and for the real estate[,] 36-48 [percent]."  In any event, the appraisals were never done.  Garza chose instead to use his own discount percentages, but even the precise percentages that he chose are unclear from the record.  They fell, more likely than not, within the range bounded by the two versions of his April 4 letter:

| Partnership | Discount Taken for Lack of Marketability and Lack of Control |
| --- | --- |
| Hurford Investments No. 1, Ltd | 25-32 percent |
| Hurford Investments No. 2, Ltd | 25-36 percent |
| Hurford Investments No. 3, Ltd | 30-42 percent |

We find with more confidence that Garza's calculations for the value of the annuity are not transparent.

To clean up some of the problems, the estate offered two expert witnesses--Mr. Preti and Mr. Henderson.  One testified that the discount factors were within acceptable limits.  The

other testified that, while Garza undervalued the FLPs, the $80,000 monthly payments exceed what the annuity payment would have been had the FLPs been correctly valued.

### 2. Creation of the Private Annuity

With the FLP values and discounts set, Garza calculated the amount of the annuity two different ways. He first consulted a mortality table and published interest rates included in a BNA tax portfolio and made the calculation by hand. Using this method, he computed an annuity payment slightly below $70,000 a month. Then he used a computer program to redo the calculation and decided that the annuity should instead be pegged at about $80,000 a month. Garza advised the Hurfords that they should use the higher number because it was "more conservative."

The private annuity that Garza prepared also had another peculiarity: It completely omitted any mention of David Hurford, listing only Michael and Michelle as purchasers of Thelma's interests in HI-1, HI-2, and HI-3 and obligors of the duty to make the monthly payments to her. All who testified on this point were credible, and therefore we find that Thelma wanted to transfer one-third of her partnership interests to David. But she also wanted to protect both him and the assets, so she thought it best not to give him signature authority. Garza testified that he knew what Thelma intended, but he could not explain how the agreement he drafted reflected in any way

Thelma's intent to give each of her children an equal share. Michael and Michelle claimed to believe that the private annuity transferred one-third of Thelma's partnership interests to David, and that David would be obligated to make the payments. On this point, we do not find them credible. Instead we find that they privately agreed to accomplish their mother's desire to give David a third of the estate, but keep him away from decisionmaking authority by keeping his name off the private annuity--just promising themselves that they would distribute to him a third of the estate when the time came (i.e., when Thelma died).

On April 5, 2000, Thelma and Michelle signed the documents. Michael was in Kentucky so the agreement was mailed to him. He signed them and mailed them back. Neither David Hurford nor Chase reviewed the agreement before it was signed.

3. How the Hurford Private Annuity Worked

To receive the annuity payments, Thelma opened an account named "Thelma Hurford Annuity Account" (THAA) at Chase. Michael asked that Chase pay Thelma by transferring assets from the HI-1 THIMA account into the THAA account. Thelma received her first annuity payment in May 2000, but she did not want all of that payment transferred into her THAA account. She herself asked that Chase transfer $40,000 of cash into her account at Boston Safe Deposit & Trust and $40,000 in stocks to the THAA. She

asked that Chase make all other payments by transferring securities from the HI-1 account into her THAA account.[11]

| Table 7: Transfers from HI-1 THIMA to TGH's Annuity Account (opened 5/17/00)[12] | | |
|---|---|---|
| Payment | Date | Amount |
| 1 | 5/15/00 | $    39,991 cash (deposited to Nations Fund) |
| 1 | 5/19/00 | $    30,570 stocks |
| 2 | 6/06/00 | $    36,420 stocks |
| 2 | 6/08/00 | $       536 cash |
| 3 | 7/03/00 | $         3 cash |
| 3 | 7/03/00 | $   100,411 stocks (or $105,636) |
| 4 | 8/01/00 | $        98 cash |
| 4 | 8/01/00 | $    90,384 stocks (or $91,512) |
| 5 | 9/01/00 | $       144 cash |
| 5 | 9/01/00 | $    87,586 stocks (or $91,892) |
| 6 | 10/4/00 | $       214 cash |

---

[11] The Commissioner argues that the annuity payments didn't consistently total $80,000 each month. It appears that he is using the tax-cost numbers reflected on the Chase account statements, instead of fair market values. For example, the Commissioner argues that in May 2000, payments totaled only $70,561. We find, however, that the fair market value of stocks transferred was $39,397 and cash was $39,990, totaling $79,387. In June, the Commissioner claims Thelma received only $39,956. But the fair market value of additions to the account was over $78,000, and in July it was approximately $78,000. We therefore find that there was not a significant variation in Thelma's monthly annuity payments.

[12] The problem of distinguishing cost and value numbers which we've already noted, *supra*, note 9, is made more difficult here, because the tax cost reported in HI-1 THIMA statements doesn't match the tax cost reported in the annuity statements. In this table, we list the annuity-statement value first, and the HI-1 THIMA-values in parentheses.

| 6 | 10/6/00 | $ 68,783 stocks |
|------|---------|-----------------|
| 7 | 11/1/00 | $ 77 cash |
| 7 | 11/1/00 | $ 158,237 stocks |
| 8 | 12/1/01 | $ 59 cash |
| 8 | 12/1/00 | $ 75,290 stocks |
| 9 | 1/02/01 | $ 75 cash |
| 9 | 1/02/01 | $ 53,567 stocks |
| 10 | 2/01/01 | $ 47 cash |
| 10 | 2/01/01 | $ 81,529 stocks |
| | **TOTAL** | **$ 658,520** |

G.    Thelma Hurford's Death and Tax Returns

Thelma's friends who testified were completely credible in their description of how bravely Thelma struggled with her cancer and how positive her attitude remained throughout the multiple surgeries and rounds of chemotherapy she endured. But her cancer never went into remission and, while she was in the hospital after her last surgery, she died on February 19, 2001.

After Gary died, Thelma had endured more than disease. She was also responsible in some way for numerous tax returns as either an individual, executrix, trustee, partner, or member of an LLC. KPMG had at first continued to prepare her tax returns, but with Hunt Oil no longer paying the bill, she went to Garza and asked him in July 2000 to refer her to a new firm. He recommended two, and she hired one of them--Turner & Stone. Before the switch, KPMG had prepared four returns:

- 1999 Income Tax Return, Form 1041, Gary T. Hurford Family Trust

- 1999 Income Tax Return, Form 1041, Estate of Gary T. Hurford

- 1999 Income Tax Return, Form 1041, Gary T. Hurford Marital Trust

- 1999 Income Tax Return, Form 1040, Gary and Thelma Hurford

Turner & Stone prepared the following returns:

- 2000 Income Tax Return, Form 1041, Gary T. Hurford Family Trust

- 2000 Income Tax Return, Form 1041, Gary T. Hurford Marital Trust

- 2000-2002 Partnership Tax Returns, Forms 1065, Hurford Management No 1, LLC

- 2000-2002 Partnership Tax Returns, Forms 1065, Hurford Management No 2, LLC

- 2000-2002 Partnership Tax Return, Forms 1065, Hurford Management No 3, LLC

- 2000-2002 Partnership Tax Returns, Forms 1065, Hurford Investments No 1, LTD

- 2000-2002 Partnership Tax Returns, Forms 1065, Hurford Investments No 2, LTD

- 2000-2002 Partnership Tax Returns, Forms 1065, Hurford Investments No 3, LTD

- 2000 Income Tax Return, Form 1041, Estate of Gary T. Hurford

- 2000 Gift Tax Return, Form 709, Thelma Hurford

- 2000 Income Tax Return, Form 1040, Thelma Hurford

- 2001 Income Tax Return, Form 1041, Estate of Gary T. Hurford

Garza prepared two returns:

- Estate Tax Return for Gary T. Hurford, Form 706, signed by Thelma as Executrix on 7/11/00

- Estate Tax Return for Thelma G. Hurford, Form 706, signed by Michael as Executor on 7/9/01

The first return relevant to this case is the estate tax return for Gary's estate. Garza himself prepared the Form 706 and Thelma signed it on July 11, 2000. We note especially a $6,543,236 deduction claimed on the return's "Schedule M-- Bequests, etc., to Surviving Spouse." Gary's estate took the deduction because it was electing to treat this sum as QTIP property. The problem is that we have no idea which property is included in that number. On the schedule M it is only described as "QTIP". At trial, when asked about the number, Garza replied that he didn't remember how he computed it.

Also on July 11, 2000, Thelma signed 1999 returns for herself and the Marital Trust. (Her 1999 return was actually a joint return, and she also signed it in her capacity as executrix of Gary's estate.) Both these returns were prepared by KPMG.

Then Turner & Stone entered the scene. That firm prepared tax returns for each of the FLPs. These returns were signed by Michelle and filed on July 8, 2001. The K-1s from each of the returns show that, during 2000, Michael's, David's, and Michelle's interest in each partnership went from 1 percent to 33 percent, while Thelma's and Gary's estate's interest dwindled

from 48 to 0 percent.  The K-1s also show that Michael, David, and Michelle each made the following capital contributions to the FLPs in 2000:

| HI-1 Capital Contribution | HI-2 Capital Contribution | HI-3 Capital Contribution |
|---|---|---|
| $1,968,957 | $2,088,593 | $556,822 |

These numbers appear to be complete fictions--we specifically find no evidence of money coming into or services provided for any of the FLPs or LLCs from the three Hurford children, much less the millions of dollars that Turner & Stone reported.  The LLCs (1-percent owner of each FLP) reported these capital contributions to the FLPs:

| HI-1 Capital Contribution | HI-2 Capital Contribution | HI-3 Capital Contribution |
|---|---|---|
| $59,665 | $63,291 | $16,872 |

On Thelma's and the estate of Gary Hurford's K-1s the space for "capital contributed during year" was left blank.

The schedule D for HI-2 shows a $6,411,000 capital gain on the "phantom stock interest--Hunt Oil" and a sale date of December 30, 2000, even though the Hurfords claim that the transfer was not a taxable event.  At trial, Michelle explained that the gain was reported in 2000 because Chase had concerns about the phantom stock's ownership.  The concern was reasonable--Hunt Oil had not sent certificates to the Hurfords showing that ownership had passed to HI-2.  Garza and Chase got together to

discuss the issue and decided that, if the Hurfords did not have the certificates when it was time to file HI-2's return, they would take the conservative approach and report that the phantom stock had been distributed.

Turner & Stone also prepared the final tax returns for the Family and Marital Trusts on June 29, 2001, and they were signed by Michael as successor trustee to his mother. There is no other evidence that the trusts were terminated. Michelle believed that Thelma terminated the trusts in early March 2000 by transferring all their property to the FLPs. This cannot possibly be true, since the bank records showed that Thelma didn't succeed in even beginning to move money into the HI-1 accounts until a week after those same accounts had supposedly been used to buy the private annuity. See *supra* p. 21, Tbls. 2 & 3.

The tax returns for the LLCs--HM-1, HM-2, and HM-3--were prepared by Turner & Stone and signed by Michelle on July 3, 2001. The K-1s from each of those returns show Michael's, David's, and Michelle's ownership in each LLC was 33.333334 percent at the end of 2000. Their K-1s also showed that each of them made capital contributions to the LLCs in 2000:

| HM-1 Capital Contribution | HM-2 Capital Contribution | HM-3 Capital Contribution |
|---|---|---|
| $19,888 | $21,097 | $5,624 |

None of the LLCs' returns included a K-1 for Thelma.  And none of these capital contributions was actually made.

The estate tax return for Thelma's estate was signed by Garza as preparer and by Michael as executor on July 9, 2001, though it was not filed until September 26, 2001.  On the return, Garza answered "No" to the following four questions:

- Did the decedent, at the time of death, own any interest in a partnership * * * or [a] closely held corporation?

- Did the decedent make any transfers described in section 2035, 2036, 2037, or 2038?

- Were there in existence at the time of the decedent's death:  Any trusts created by the decedent under which the decedent possessed any power, beneficial interest, or trusteeship?

- Was the decedent ever the beneficiary of a trust for which a deduction was claimed by the estate of a pre-deceased spouse under section 2056(b)(7) and which is not reported on this return?

Whether Garza correctly answered the first two of these questions is, as we shall see, a central issue in this case. Whether he answered the third question correctly is also in dispute:  Though Thelma's estate claims that transferring property out of the Marital and Family Trusts terminated them, the Commissioner argues that property was left in the trusts by Garza's faulty execution of his plan.

Garza's answer of "no" to the final question is just egregiously false.  He himself had prepared Gary's estate tax return and should have known that section 2056(b)(7) refers to a

QTIP trust like the one for which he claimed a deduction on that return.[13]

The assets reported on Thelma's estate tax return were:

| | |
|---|---|
| Arlington residence | $165,000 |
| Thelma Hurford annuity account | 348,296 |
| Mortgages, notes, and cash | 282,660 |
| Life insurance | 5,000 |
| Miscellaneous property | 45,710 |
| Total | 846,666 |

The estate reported that Thelma made no taxable gifts other than gifts includable in her gross estate. Thelma's estate took a $45,000 deduction for attorney's fees.

Michael, who was now executor for both his parents' estates, signed and filed a 2000 Form 1041 prepared by Turner and Stone for Gary's estate on July 12, 2001. On this return, he reported half the proceeds (the other half being Thelma's community property) from the exercise of the options for Nabors stock and its subsequent sale as well as the sale of the house in Tyler. He also reported $194,921 in the "other income" section as the estate's portion of the private annuity. This is odd because, even though Gary's estate owned 48 percent of each FLP, it was not a party to the private annuity nor was it meant to be.

_____

[13] Gary's will directed the residuary of his estate to the Marital Trust, which allowed for a QTIP election.

Michael also filed Thelma's 2000 gift tax return using Form 709 on August 12, 2001. This return was also prepared by Turner & Stone, and they reported that Thelma made $775,000 in gifts, $675,000 of which were taxable. These included the $225,000 gifts she had made to each of her children, the $10,000 gifts to her children and other relatives, and two $10,000 trusts she created for her grandchildren. They also reported that she owed no tax on these gifts because she was using her unified credit. The preparer answered "no" to the question "[h]ave you (the donor) previously filed a Form 709 for any other year?"

The final return was Thelma's last individual income tax return, which Michael filed on August 12, 2001, after Turner & Stone prepared it. They reported that the IRS owed Thelma a $238,948 refund, though the refund had not been included as an asset on Thelma's estate tax return. Most of this reported income came from her one-half interest in the proceeds from the sale of the Nabors stock and her accumulated income from the private annuity.

H.  Estate and Gift Tax Returns' Audit

On November 18, 2004, Thelma's estate received two notices of deficiency--one for her 2000 estate tax return and the other for her 2000 gift tax return. The notices set out large deficiencies and penalties:

|  | **Estate Tax Return** | **Gift Tax Return** |
|---|---|---|
| Deficiency | $9,805,082 | $8,314,283 |
| Penalties | 1,956,066 | 1,662,857 |

The notice of deficiency prompted by the gift tax return characterized the $14,981,722 Thelma transferred under the guise of the private annuity as gifts to Michael and Michelle because the annuity's real fair market value was $0.

The notice of deficiency sent to the estate had a longer list of adjustments:

- The properties in Ellis and Dallas counties should have been included in Thelma's estate.

- The value of the THAA at Thelma's death was $426,206 and not $348,296.

- Thelma's estate should have included her one-half interest in a Bank of America account and all of a Deutsche Bank account.

- The private annuity was a sham and all the property that she transferred to Michael and Michelle should have been included in her estate.

- The transfers to HI-1, HI-2, and HI-3 should be included in Thelma's estate under section 2035.

- The estate failed to substantiate a $45,000 deduction for attorney fees.

- The $675,000 in gifts that Thelma made in 2000 are includable in her estate.

The penalties asserted in both notices were for negligence or disregard of the rules and regulations.

Thelma's estate has conceded an increase in the estate's value of $3,381,999 because Garza failed to report the money

Thelma received when she liquidated her IRA, her individual tax refund, and the proceeds from the sale of the Nabors stock. The estate also concedes that the true value of Thelma's THAA account was $426,206. The main issue that we are left to decide is what else should have been included--specifically, whether Thelma's transfers to the FLPs and the subsequent private-annuity transaction were valid under sections 2035, 2036 and 2038. Also at issue:

- What is the effect of the QTIP election made on Gary's estate tax return;

- Should the $675,000 in gifts that Thelma made in 2000 be excluded from her estate tax return?;

- May the estate deduct $45,000 in attorney's fees?;

- Is Thelma's estate liable for section 6662 penalties?

OPINION

I. What is Includable In Thelma's Estate?

The Code imposes a tax on a decedent's taxable estate, which it defines as the value of the gross estate minus any allowed deductions. Secs. 2001(a), 2051. The gross estate is the value of the property in which a decedent had an interest at the time of her death. Sec. 2033. Sections 2034 through 2045 tell us what property to include in that estate. In this case, the Commissioner argues that sections 2035, 2036 and 2038 bring back into Thelma's estate the property that Garza tried to transfer out of it via the FLPs and private annuity.

Section 2036(a)(1) includes in a decedent's gross estate property that she transferred to another but in which she keeps a right to possession or enjoyment or income until death. The paradigm is a gift or low-ball sale from A to B of property in which A retains a life estate. And the target is lifetime transfers that are essentially testamentary in nature. United States v. Estate of Grace, 395 U.S. 316, 320 (1969); Estate of Bongard v. Commissioner, 124 T.C. 95, 112 (2005).

Section 2036(a)(2) includes in the estate property in which a decedent keeps until death a right to designate a person who gets possession or enjoyment of, or the income from, the transferred property. It covers many of the same situations also governed by section 2038(a)(1), Estate of Wall v. Commissioner, 101 T.C. 300, 313 (1993), which includes in an estate any property that a decedent transfers while keeping a right to revoke or change the transfer. Both sections 2036 and 2038 contain the same parenthetical exception for *bona fide* sales for an adequate and full consideration. Secs. 2036(a), 2038(a)(1).

The Commissioner also relies on section 2035(a), which requires us to reach back and include property in Thelma's estate if section 2036 or 2038 would have included it in her estate but for her terminating her retained interest within three years of death.

Depending on how these sections affect what's included in Thelma's gross estate, we may also have to decide what property should be included because of the QTIP election made on Gary's estate tax return and a potential miscalculation in the estate-tax computation arising from the gifts Thelma made during the last several months of her life.

A.    Positions of the Parties

Apart from some comparatively minor concessions, the estate claims that Thelma's estate and gift tax returns were correct. It acknowledges Garza's sloppiness but argues that Thelma's estate plan should be respected despite all the missteps. On the major questions, it argues that sections 2035, 2036, and 2038 don't apply because Thelma transferred her property into the FLPs and then into the private annuity through *bona fide* sales for adequate and full consideration.  It also contends that none of these sections apply because Thelma did not retain possession or enjoyment of, or the right to receive income from, the property after it was transferred.

The Commissioner attacks the entire estate plan as nothing more than a transparently thin substitute for a will.  He argues first that the property transferred to the FLPs is includable in Thelma's estate because Thelma kept control over the assets after the transfer, and because there was an implied agreement among the Hurfords for Thelma to do so.  He also argues that Thelma's

transfer of her property (and the property of the Trusts) in exchange for an interest in the FLPs was neither *bona fide* nor done for adequate and full consideration.  The same is true for the exchange, only two weeks later, of her interest in those FLPs for the private annuity:  The Commissioner argues that there is grossly insufficient evidence that the exchange of Thelma's interests in the FLPs for the private annuity was a *bona fide* sale for adequate and full consideration, and also argues that Thelma continued to control these assets well after the transaction was complete.

He next contends that Garza mangled Gary's estate plan by terminating the Family Trust, leading to the inclusion of that Trust's assets in Thelma's own taxable estate.

Finally, the Commissioner argues that section 2044 requires Thelma's estate to include the value of the property identified on Gary's estate tax return as a QTIP deduction.  This is a fallback position--if all his other arguments fail, he is contending that at least the approximately $6.5 million deduction that Gary's estate took on its return for QTIP property must be matched by an inclusion of $6.5 million on Thelma's estate tax return.

B.    The Private Annuity and the FLPs

We begin with the language of the Code.  Section 2036(a) states:

SEC. 2036(a).  General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (*except in case of a bona fide sale for an adequate and full consideration* in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--

(1) *the possession or enjoyment of, or the right to the income from, the property*, or

(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

(The italicized portions are the key phrases for this case.)

In Estate of Bongard, we said section 2036 pulls transferred property back into a decedent's estate if:  (1) The decedent made an *inter vivos* transfer of property (no one doubts Thelma did this); (2) the decedent's transfer was not a *bona fide* sale for adequate and full consideration; and (3) the decedent kept an interest or right in the transferred property of the kind listed in section 2036(a) which she did not give up before she died.  Estate of Bongard, 124 T.C. at 112.

In other words, section 2036(a) has two exceptions to a general rule that includes in her estate all *inter vivos* transfers of her property.  The first exception excludes assets in a transfer if it is a *bona fide* sale for adequate and full consideration.  Hunting for the *bona fides* of a transfer is a

question of motive--did Thelma have a legitimate and significant nontax reason, established by the record, for transferring her property?  Deciding whether a transfer was for adequate and full consideration is a question of value--did what Thelma give up roughly equal the value of what she received?  Estate of Bongard, 124 T.C. at 118.[14]

The second exception--applicable even if the transfer is an outright gift--takes the transferred property out of the estate

> if the decedent did not retain either the
> (1) possession, enjoyment or rights to the
> transferred property, or (2) the right to
> designate the persons who would possess or
> enjoy the transferred property.

Kimbell v. United States, 371 F.3d 257, 261 (5th Cir. 2004).

Section 2038 says:

> SEC. 2038(a).  In General.--The value of the gross
> estate shall include the value of all property--
>
> (1) Transfers after June 22, 1936.--To
> the extent of any interest therein of which

------

[14] Kimbell phrases the test somewhat differently, holding that a sale is *bona fide* if the transferor "actually parted with her interest in the assets transferred and the [transferee] actually parted with the partnership interest in exchange;" and a sale is for adequate and full consideration if issued  "the exchange of assets * * * does not deplete the estate."  Kimbell, 371 F.3d at 265.  If read in isolation, this might look like an instruction pointing us to judge *bona fides* purely in terms of legal effectiveness.  But the Kimbell court also carefully noted that "a transaction motivated solely by tax planning with no business or corporate purpose is nothing more than a contrivance without substance that is rightly ignored."  Id. at 264.  We don't think, therefore, that Kimbell and Estate of Bongard stake out different tests; but if they do, the series of deals in this case fails both.

the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished during the 3-year period ending on the date of the decedent's death.

In Estate of Mirowski v. Commissioner, T.C. Memo. 2008-74, we framed section 2038 as pulling transferred property back into a decedent's estate if: (1) the decedent made an *inter vivos* transfer of property; (2) the decedent's transfer was not a *bona fide* sale for adequate and full consideration; and (3) the decedent kept an interest or right in the transferred property of the kind listed in section 2038(a) which she did not give up before she died or which she relinquished within the three-year period ending on the date of her death.

There are two sets of transfers that we need to consider-- transfers by Thelma of her own and the Trusts' property in exchange for interests in the FLPs, and her exchange of the FLPs for the private annuity. We address the validity of each transaction separately because they have independent estate-

tax consequences.  The FLPs, if valid, may well entitle the estate to value interests in them at a discount to the property they hold.  The private annuity, if valid, would then remove a very large part of the FLPs' value from the estate altogether.

We start at the end, looking first to see if the exchange of Thelma's interest in the FLPs for the private annuity was *bona fide* and supported by fair and adequate consideration.[15]  Then we look at what interest she retained in the assets exchanged for the private annuity throughout the last year of her life.  And we do the same analysis for the transfers by Thelma (and the Trusts) in exchange for interests in the FLPs.

1.  Was the Private Annuity Effective to Remove Assets from Thelma's Estate?

   a.  *Was the Transfer of Thelma's Interest in the FLPs for the Private Annuity* Bona Fide *and for Adequate and Full Consideration*?

Kimbell teaches that a court has to consider separately the *bona fides* of a transfer and whether it was supported by adequate and full consideration.  Kimbell, 371 F.3d at 262.  We begin by finding that the private annuity agreement was not *bona fide*, but

---

[15] The estate argues that an unpublished Fifth Circuit case, Estate of McLendon v. Commissioner, 77 F.3d 477, (5th Cir. 1995), revg. T.C. Memo. 1993-459, stands for the proposition that the *bona fides* of a private-annuity transaction are irrelevant to its validity.  Estate of McLendon stands for no such thing--the opinion even quotes the section imposing the requirement of *bona fides*--but it decides the case on other grounds.

was instead "a disguised gift or a sham transaction."  Id. at 263
(citing Wheeler v. United States, 116 F.3d 749, 767 (5th Cir.
1997)).  There are two key pieces of evidence.

The agreement that Garza drafted transferred Thelma's
interest only to Michael and Michelle.  Thelma intended to limit
David's control over the property she was giving to her children,
but we specifically find that she did not intend to disinherit
him.  A more artful attorney might have written a private annuity
that made David's rights and obligations clear without giving him
the ability to deplete the FLPs' assets.  Garza assumed, however,
that Michael and Michelle would ignore what he had drafted and
they had signed, and instead carry out (as they ultimately did)
Thelma's true intentions.  That rendered the private annuity a
sham--nothing more than a substitute for a will leaving Thelma's
estate in equal shares to her children.  See, e.g., Estate of
Rector v. Commissioner, T.C. Memo. 2007-367 (similar reasoning in
a failed FLP case).[16]

The second key piece of evidence is in what she transferred.
In April 2000, she transferred all of her interest in each FLP to
two of her children, including all the marketable securities and

---

[16]  If the problem with the private annuity was merely one
of inadequate consideration, we would include only the excess of
what was transferred over what Thelma received in her estate.
Sec. 2043.  But because we are finding that the FLPs were in
effect not transferred, and Thelma retained an interest in them
until death, we include the entire value of the property
transferred for the private annuity in her estate.

cash in HI-1.  Then in May she received her first payment--
$40,000 of the cash and $40,000 of the securities that she'd just
transferred to Michael and Michelle.  In every subsequent month,
she received back another $80,000 of cash and securities that she
had transferred.  Thelma's children did not use their own assets,
let alone the income from the assets in the FLPs, to make these
payments.  They couldn't have.  Even collectively they could not
afford to pay Thelma $80,000 a month.  What Thelma's children did
instead was to hold the assets in the exact same form that they
were in before the private annuity and then slowly transfer bits
and pieces of them back to her, planning to divide what was left
over (including a share for David), after she died.  Again, this
makes the private annuity look much more like a testamentary
substitute than a *bona fide* sale.

To be *bona fide*, a transaction need not be between
strangers.  Estate of Bongard, 124 T.C. at 123.  But there must
be some objective proof that the transaction wouldn't materially
differ if the parties involved were negotiating at arms' length.
Id.  Any such finding would be insupportable here.

Thelma's transfer of her interest in Gary's estate to the
children as part of the private annuity looks even less like a
*bona fide* sale.  According to Garza, Thelma transferred her
interest in Gary's estate to the FLPs by first transferring the
Marital and Family Trusts to herself, disregarding their

formalities.  He described the transaction at trial:  "Well, she's transferring, in the capacity of trustee, to herself in the capacity of recipient.  It would be like me doing a document to transfer money from one pocket to another pocket."  Garza went on to clarify that she completed this transaction simultaneously with the transfer to her children without putting anything in writing.

We're skeptical.  The account statements reveal that the Marital and Family Trust assets, along with assets in an account in the name of Gary's estate, were all transferred into the HI-1 partnership.  These accounts remained separately titled during the private-annuity transaction and then until Thelma's death, even though Garza testified that Thelma distributed the Family and Marital Trust assets to herself and sold them to her children.  (That's the estate's explanation for how Thelma obtained a 96.25-percent interest in the FLPs prior to the private-annuity transaction.[17])

We next turn to whether Thelma received adequate and full consideration when she transferred her assets for the private annuity.  The key is whether what Thelma received is roughly equivalent to what she gave up.  "'[U]nless a transfer that depletes the transferor's estate is joined with a transfer that

---

[17] Using the Family and Marital Trust assets in this way may have independent estate-tax consequences, and we address these issues later.

augments the estate by a commensurate (monetary) amount, there is no "adequate and full consideration"'." Kimbell, 371 F.3d at 262 (quoting Wheeler v. United States, 116 F.3d at 762). It is on this point that the private annuity is most vulnerable.

We have already found that Garza conjured the partnership discounts out of the air. But even if those discounts were correct, Garza undervalued each FLP interest sold in the private annuity. On April 1, 2000, the balances of the accounts that eventually were transferred to HI-1 were:

| Account* | 4/1/00 Balance |
|----------|----------------|
| THIMA | $4,263,636 |
| MT | $ 547,192 |
| FT | $ 713,813 |
| **Total** | **$5,524,641** |

*Note that these are not even HI-1 accounts. Chase did not begin transferring the assets out of these accounts into HI-1 accounts until after the private annuity was completed. Given the many problems with these transactions, we are going to call this one administrative delay and move on.

Garza, in his April 4 letter, valued HI-1's assets at $3,250,334 --the value from Gary's estate tax return.

Garza put the same lack of effort into valuing HI-2. A Chase employee got a revised estimate of the value of the Hunt Oil phantom stock by giving Massman a call in February 2000. At that time Massman valued the phantom stock at $6.4 million, which

is almost $1 million more than the $5.5 million value Garza took from Gary's estate tax return.

There is no record evidence of a boom or a bust in the Texas farm-and-ranch property market from April 1999 to April 2000, but we are certain that a careful attorney would have had the properties in HI-3 reappraised before including them in the private annuity.[18]  To meet section 2036(a)'s requirement that the transfer was "for adequate and full consideration in money or money's worth," Garza should have determined the fair market value of the properties at the time of transfer so that the value of the annuity received would be roughly equal to that of the property sold.  Wheeler, 116 F.3d at 759 ("adequate and full consideration under the exception to section 2036(a) requires only that the sale not deplete the gross estate").  Recall that Garza just took the values off Gary's estate tax return--values which included properties not even held by HI-3.

We therefore hold on the basis of these findings that the transfer of Thelma's FLP interests for the private annuity must be ignored, and the value of the FLPs must be added to her estate unless she retained neither possession, nor enjoyment of, nor the right to income from the transferred property, nor the right to designate the persons who would possess or enjoy that property.

_____

[18] For a definition of fair market value for purposes of the estate and gift transfer taxes, see sec. 20.2031-1(b), Estate Tax Regs., sec. 25.2512-1, Gift Tax Regs.

b. *Did Thelma Retain a Prohibited Interest in the Property She Transferred to Her Children through the Private Annuity?*

Because we find Thelma didn't receive adequate consideration in a *bona fide* sale for the transfer of her property for the annuity, her estate needs to show under section 2036(a)(1) that she did not keep possession or "enjoyment" of that property after the private annuity agreement. "[A] transferor retains the enjoyment of property if there is an express or implied agreement at the time of the transfer that the transferor will retain the present economic benefits of the property, even if the retained right is not legally enforceable." Estate of Reichardt v. Commissioner, 114 T.C. 144, 151 (2000); see sec. 20.2036-1(a), Estate Tax Regs. For example, "the existence of formal legal structures which prevent de jure retention of benefits of the transferred property does not preclude an implicit retention of such benefits." Estate of Bongard, 124 T.C. at 129 (citing Estate of Thompson v. Commissioner, 382 F.3d 367, 375 (3d Cir. 2004). Estate of McNichol v. Commissioner, 265 F.2d 667, 671 (3d Cir. 1959), affg. 29 T.C. 1179 (1958)).

Now it is true that Thelma's relationship to the assets changed after the private annuity. She didn't need to regularly dip into the FLPs once she began receiving $80,000 a month under the annuity. But as previously discussed, her children paid her with the very assets she supposedly sold to them. Her monthly

payments came directly from HI-1 THIMA, which was an FLP account, meaning that she retained a present economic benefit from her assets after she "sold" them. Admitting that Michael and Michelle couldn't afford to pay $80,000 per month to their mother, Garza testified that the plan all along was for the children to "pay the payments from the assets in the private annuity that they purchased." See *supra* pp. 35, Tbl. 7. She also continued to make deposits into the various FLP accounts, shifted assets between accounts, and otherwise treated them as if they were her own rather than actually transferred to Michael and Michelle. See, e.g., *supra* p. 20, Tbl. 1. After the private annuity agreement, Thelma never resigned as president of the LLCs and remained a party to the farm leases. She also had ongoing signature authority over assets in HI-1's Chase accounts, which she exercised after the annuity agreement. At trial, Michelle testified that her mother withdrew money from HI-1 to pay her income taxes after she sold the partnership interests to her children.

Q    All right. Do you recall on or around April 14 of
     2000 that your mother needed $65,000?

A    Yes.

Q    Okay. And she needed that to pay taxes. Correct?

A    To pay estimated taxes, yes.

Q    Okay. And this money, this $65,000--she took
     this money out of a family limited partnership
     account. Correct?

A    This money was taken out of the family limited partnership shortly after the time we did the private annuity transaction, because my mother's private annuity payments were not to kick in until the first week of May.  She needed the money to pay the taxes, and so this is what happened.  The biggest concern was getting the taxes paid.

Q    So there was a transfer taken out of a family limited partnership account to cover that then?

A    Yes.

Thelma also made it clear to Michael and Michelle, even after the private annuity was signed, that they were to make sure that David got one-third of the property in the FLPs.  Garza testified that there was "no design to not include David; [Thelma] just didn't want him to have managerial signature rights."  And Michelle said at trial that although the private annuity didn't include David on paper, he was equally included with his two siblings.  The Hurfords therefore treated David as a coowner in the FLPs after the annuity was in place.  Michelle plainly stated, "[David] was a part of the private annuity agreement.  He's a one-third owner."  Michael and Michelle followed their mother's directions for the disposition of her property, even after she supposedly gave up any interest in it.  Under section 2036(a)(2), we find this to be an exercise by Thelma of a "right, either alone or in conjunction with any other person, to designate the persons who shall possess or enjoy the property."  We also find that it is the exercise of a power by

Thelma altering or amending the transfer of the property going to pay for the private annuity of the sort described in section 2038(a)(1).  The consequence is, again, to pull the FLPs back into her gross estate.

We therefore find that, under sections 2036 and 2038, Thelma retained an impermissible interest in the assets she had tried to transfer to her children through the private annuity.  All the assets "sold" to Michael and Michelle in the private annuity transaction must be included in Thelma's estate.[19]  And that means we need to address the validity of the FLPs themselves and whether or not the estate may take discounts resulting from that form of ownership.

2.   Were the FLPs Valid?

a.   *Was the Creation of the FLPs Bona Fide and for Adequate and Full Consideration?*

As with the exchange of FLPs for the private annuity, Thelma's exchange of property for interests in the FLPs must be *bona fide* and for adequate and full consideration if it is to be effective at removing property from her taxable estate.  Compared to private annuities, however, caselaw on the subject of FLPs is a rich source of analogous fact patterns and helps us figure out

---

[19] Because we're including in Thelma's estate the assets that went to pay for the private annuity, we hold against the Commissioner on his alternate assertion of a gift tax and associated negligence penalty in docket number 23954-04.

where on the spectrum of legitimate tax planning Thelma's estate lies.

Let's start with the FLPs' *bona fides.* We focus on Thelma's motivation for moving her property into the FLPs. One motive is obvious. Neither the Hurfords nor Garza are shy about admitting that they created the FLPs for the valuation discounts. At trial, Garza said he and the family "discussed discounts * * * more than a dozen times." But they are equally insistent that the FLPs had other purposes. Garza listed ten reasons on each of the FLPs' partnership agreements (numbering as in the original):

1. provide resolution of any disputes which may arise among the Partners in order to preserve Partnership harmony and avoid the expense and problems of litigation;

2. maintain and centralize control of Partnership Assets;

3. consolidate fractional interests in Partnership Assets to achieve cost savings and to allow those Assets to be managed in an orderly manner;

4. increase Partnership wealth;

5. continue the ownership of Partnership Assets and restrict the right of non-Partners to acquire interests in Partnership assets;

6. provide protection to Partnership Assets from claims of future creditors against Partnership members;

8. prevent the transfer of a Partnership member's interest in the Partnership as a result of a failed marriage;

9. provide flexibility in business planning not available through trusts, corporations, or other business entities;

10.  facilitate the administration and reduce the cost associated with the disability or probate of the estate of Partnership members; and

11.  promote the Partnership's knowledge of and communication about the management, responsibilities, and benefits of Partnership Assets.

We do not just look at a list of reasons, though.  Thelma's nontax reason has to be a significant factor motivating creation of the partnerships and not merely a theoretical justification, and we've observed before that taxpayers often disguise tax-avoidance motives with a rote recitation of nontax purposes.  See Estate of Bongard, 124 T.C. at 118.  As the Third Circuit said in Estate of Thompson, 382 F.3d at 383 (quoting Gregory v. Helvering, 293 U.S. 465, 469 (1935)) "Even when all the 'i's are dotted and t's are crossed,' a transaction motivated solely by tax planning and with 'no business or corporate purpose * * * is nothing more than a contrivance.'"  As we have seen, Garza did not make a rigorous effort to correctly form the FLPs.  He left many of the i's undotted and t's uncrossed.  But we won't disregard Thelma's transfers to the FLPs because of his sloppiness.  Instead we'll examine the evidence to see whether any of these nontax reasons was a significant factor in founding the FLPs.  Estate of Bongard, 124 T.C. at 118; Estate of Harper v. Commissioner, T.C. Memo. 2002-121.

Of the ten listed nontax purposes, the Hurfords rely mainly on asset protection and asset management.  They claim that the

assets needed protection from the liabilities associated with the farm and ranch properties and from creditors. As for asset management, they claim that the FLPs would consolidate the management of the cash and securities held by Thelma, the Marital Trust, and the Family Trust.

We have found in other cases that similar claims about asset protection, without supporting evidence, were insufficient proof of a significant nontax purpose. See Estate of Bongard, 124 T.C. at 128 (FLP's credit-protection function already served by existing trusts); Estate of Korby v. Commissioner, T.C. Memo. 2005-102, (failure to show FLP would protect assets from creditors) affd. 471 F.3d 848 (8th Cir. 2006); Estate of Korby v. Commissioner, T.C. Memo. 2005-103, (FLP no greater protection than previous form of ownership) affd. 471 F.3d 848 (8th Cir. 2006); Estate of Rosen v. Commissioner, T.C. Memo. 2006-115 . And we find that placing the assets in FLPs provided no greater protection than they had while held by the Family or Marital Trusts, or in Thelma's own name. Nor have the Hurfords convinced us that giving each child a small ownership interest reduced the risk of a creditor's reaching the assets. And we cannot find in this case any advantage in consolidated management that Thelma or the two trusts gained from the transfer, particularly because the partners' relationship to the assets didn't change after formation. Estate of Reichardt v. Commissioner, 114 T.C. at 152.

While we have found that consolidated asset management can be a significant nontax purpose, Estate of Schutt v. Commissioner, T.C. Memo. 2005-126, we have also denied that such a purpose is significant where a FLP is "just a vehicle for changing the form of the investment in the assets, a mere asset container." Estate of Erickson v. Commissioner, T.C. Memo. 2007-107. We find that asset management and asset protection were not significant non-tax purposes in this case.

What was the purpose of the FLPs then? We've already mentioned the Hurfords' desire to discount the value of Thelma's property. But that finding's not enough by itself; we have developed in our caselaw a longer list of factors that, if present, will incline us to find that the transfer of property to a FLP was not motivated by a legitimate and significant nontax reason. These factors include:

- The taxpayer's financial dependence on distributions from the partnership, Estate of Thompson v. Commissioner, T.C. Memo. 2002-246; Estate of Harper v. Commissioner, T.C. Memo. 2002-121;

- whether the taxpayer commingled her own funds with partnership funds, Estate of Reichardt, 114 T.C. at 152

- the taxpayer's delay or failure to transfer the property to the partnership, Estate of Hillgren v. Commissioner, T.C. Memo. 2004-46; Estate of Rosen v. Commissioner, T.C. Memo. 2006-115;

- the taxpayer's old age or poor health when the FLP was formed, Estate of Rosen, T.C. Memo.

2006-115; <u>Estate of Korby v. Commissioner</u>,
T.C. Memo. 2005-103, <u>Estate of Korby v.</u>
<u>Commissioner</u>, T.C. Memo. 2005-102, affd.
471 F.3d 848 (8th Cir. 2006); and

- whether the FLP functioned as a business enterprise or otherwise engaged in any meaningful economic activity, <u>Estate of</u> <u>Bongard</u>, 124 T.C. at 126.

Adherence to partnership formalities is a theme underlying many of these factors. See <u>Estate of Harper</u>, T.C. Memo. 2002-121. And the Hurfords' disregard for partnership formalities began early. Thelma asked Chase just a few weeks after creating the FLPs to distribute $65,000 from HI-1 so she could make an estimated income tax payment, because she had transferred nearly all of her liquid assets to HI-1--strong evidence that she was financially dependent on distributions from the partnership. The HI-1 partnership made another mistake when it reported on Thelma's K-1 that she received no disbursements in 2000, which is evidence that everyone was still treating HI-1's assets as Thelma's own.

Thelma also commingled her own funds with the partnerships' until shortly before she died on February 19, 2001--and long after the Hurfords supposedly traded the FLPs for the private annuity. Chase transferred the proceeds from the sale of the Tyler house into the HI-1 THIMA account. Thelma herself transferred the proceeds from her IRA to the HI-1 THIMA account

in December 2000.  See *supra* p. 22, Tbl 5.  But neither the Tyler house nor the IRA were meant to be partnership property.

The Hurfords also disregarded partnership formalities by significantly delaying the transfer of the assets from Thelma and the trusts to the FLPs.  Many of HI-1's assets remained in Thelma's and the trusts' accounts for several months after the FLPs were formed.  HI-2 had similar problems.  Hunt Oil did not even acknowledge that HI-2 owned the phantom stock until January 2001.  While the estate argues that the official transfer date was March 22, 2000, it has not explained why it took so long to complete the paperwork.  The transfer of the Dallas/Ellis County property to HI-3 was put off for two years, and we've already recounted how disordered the other deeds were.

The other underlying theme in our caselaw is that a FLP needs to be a functioning business or at least have some meaningful economic activity.  Estate of Bongard, 124 T.C. at 126.  It's easy enough to show this if a working business is contributed to a FLP.  See Kimbell, 371 F.3d at 267 (working interest in oil and gas properties).  We've also found that a FLP may have meaningful economic activity where the partnership furthers family investment goals or where the partners work together to jointly manage family investments.  Estate of Mirowski, T.C. Memo. 2008-74; Estate of Schutt v. Commissioner, T.C. Memo. 2005-126.  But where none of the partners was involved

in conducting the partnerships' business, it's unlikely that the transfer has a legitimate and significant nontax reason.  See Estate of Thompson, 382 F.3d at 379.

Look at the FLPs in this case.  HI-1 just held marketable securities and cash.  The Hurfords did not have even a minimal involvement in deciding which securities HI-1 should own, or even whether it should buy or sell.  Cf. (Estate of Schutt, T.C. Memo. 2005-126, where we said that while the mere holding of securities in an untraded portfolio is a negative factor, the record in that case reflected a significant nontax reason for creating the FLPs).  All investment decisions were left to Chase, and the same people at Chase made the decisions before and after the assets were moved to HI-1.  HI-2 required even less of the Hurfords than HI-1.  The only choice they could make concerning the Hunt Oil phantom stock was to hold it or to cash out.  The HI-3 partnership did hold real estate, but again, the partnership was not actively managing any of the farms or ranches.  The three leases of those properties were all in place when HI-3 was formed and the Hurfords did nothing more than collect rent.  There is no evidence that the partners met to discuss family business or investment strategy, or even discuss the partnerships' profits or losses.  This would have been difficult given the partnerships' mayfly-like life span:  they were hatched and dispatched to the private-annuity transaction in a few weeks' time, and afterward

served primarily as a holding pen to fund Thelma's monthly annuity payments.  See *supra* p. 35, Tbl. 7.

This leaves only the Hurfords' drive for a discount as a reason for creating the FLPs.  And we do find that their purpose was nothing more than allowing the Hurfords to claim a discount when Thelma transferred her interest in them to her children for the private annuity; there was no nontax business or economic reason for them to exist.  Michelle's notes from one of the initial meetings with Garza confirm this.  She wrote, "have kids own 1 percent of everything to maximize discount advantage."  We thus find that Thelma's transfers to the FLPs were not *bona fide* sales.

Even if the transfers were *bona fide*, we would find that they were not for adequate and full consideration.  The general test for deciding whether transfers to a partnership are made for adequate and full consideration is to measure the value received in the form of a partnership interest to see if it is approximately equal to the property given up.  Estate of Bongard, 124 T.C. at 118; Kimbell, 371 F.3d at 262.  But Kimbell also teaches more specifically that we should focus on three things:

> (1) whether the interests credited to each of the partners was proportionate to the fair market value of the assets each partner contributed to the partnership,

> (2) whether the assets contributed by each partner to the partnership were properly

> credited to the respective capital accounts
> of the partners, and
>
> (3) whether on termination or dissolution of
> the partnership the partners were entitled to
> distributions from the partnership in amounts
> equal to their respective capital accounts.

Id. at 266.

We phrase our own test a bit differently:  We look to see if "All partners in each partnership received interests proportionate to the fair market value of the assets they each transferred, and partnership legal formalities were respected."  Estate of Bongard, 124 T.C. at 117.

It is obvious that the value of Thelma's interest in each FLP was worth less than the assets she contributed.  For all three FLPs, Thelma's and Gary's estates[20] each received a 48-percent interest and the three children and the LLC each received a 1-percent interest gratis.  But for HI-2 and HI-3, Thelma and Gary's estate contributed 50 percent of the assets.  What Thelma contributed to HI-1 was even more disproportionately large compared to the interest she received.  Thelma transferred almost $4 million of assets to HI-1 in April 2000.  The Family and

---

[20] Recall that the "Gary T. Hurford Trust" was given a 48-percent interest in the partnerships, but that no such trust actually existed.  Instead, the Family and Marital Trusts created under Gary's will, together with an account holding other assets from Gary's estate, were all contributed to the HI-1 partnership, and eventually consolidated in the HI-1 THIMA account long after the private annuity transaction was completed.  See supra pp. 20-23.

Marital Trusts contributed a little under $1.2 million combined. Even assuming the Gary T. Hurford Trust existed as a valid partner, these numbers show that each partner's interest in each of the FLPs did not reflect his or her or its contribution.

It is equally obvious that there was no pooling of assets in the interest of creating true joint ownership or starting a new enterprise--Thelma and Gary's estate contributed everything. There was no contribution from any of the Hurford children either in money, property, or services, nor were their partnership interests reported as gifts to them. And we've already found that the crediting of the partners' capital accounts was entirely fictional. See *supra* p. 39. Thelma's unilateral contribution supports an inference that only a desire for tax savings motivated the FLPs' formation. See Estate of Harper, T.C. Memo. 2002-121; cf. Estate of Harrison, T.C. Memo. 1987-8 (where other partners made significant contributions at formation, the partnership served as a vehicle for a genuine pooling of interests).

For a FLP to work, the minority interest holders must at a minimum receive their interests either by gift or by contributing their own assets or services. Section 1.704-1(e)(1)(iii), Income Tax Regs., provides that

> A donee or purchaser of a capital interest in
> a partnership is not recognized as a partner
> * * * unless such interest is acquired in a
> *bona fide* transaction, not a mere sham for

> tax avoidance or evasion purposes, and the
> donee or purchaser is the real owner of such
> interest. * * *

This didn't happen here--the Hurford children neither contributed their own property nor did Thelma report gifts to them of partnership interests.  We have found no legal authority for Garza's position that partners can have a partnership interest with nothing more than a shuffle of paper.  We therefore cannot recognize the Hurford children as true partners of the FLPs.

We find that the only purpose the FLPs served in Garza's scheme was to allow the Hurfords to take a discount when Thelma transferred her assets for the private annuity a short time after the partnerships were formed.  Therefore, we find that Thelma's transfers to the FLPs were not *bona fide* sales for adequate and full consideration.

> b. <u>Did Thelma Retain the Possession or Enjoyment of, or the Right to the Income From, the Property She Transferred to the FLPs in Violation of Section 2036(a)(1)?</u>

One question remains:  Must we discount the value of those assets now included in Thelma's estate for lack of control and lack of marketability because they consist of interests in FLPs?  The answer depends on whether we would've looked past the FLP to include the underlying assets in those FLPs in Thelma's estate absent the private annuity transaction.  We return to the same analysis under section 2036(a)(1) to find the answer.

The key is whether there was an express or implied agreement at the time of the transfer to the FLPs that Thelma would keep the present economic benefits of the property, even if the retained right were not legally enforceable. Estate of Reichardt, 114 T.C. at 151 (citing references omitted). We have found implied agreements when:

- The decedent used FLP assets to pay his personal expenses, e.g., Estate of Rosen, T.C. Memo. 2006-115;

- the decedent transferred nearly all of his assets to the FLP, e.g., Estate of Reichardt, 114 T.C. 144 (2000); and

- the decedent's relationship to the assets remained the same before and after the transfer, e.g., Estate of Reichardt, 114 T.C. 144 (2000); Estate of Rosen, T.C. Memo. 2006-115.

Garza's plan plunges this case right into these precedents. The key proof of an implied agreement that Thelma would continue to be able to enjoy her property after she gave nearly all of it to the FLPs lies in evidence of what happened after the FLPs were formed--they were shuttled right into the private annuity just weeks after they were created and before they were fully funded with Thelma's assets. And Thelma received her very own assets back from her children as payments under the private-annuity agreement. Yet even though Thelma supposedly held an interest in the FLPs for only a few weeks, we've already recounted how she impermissibly took distributions for her living expenses directly from the FLP accounts. And like many of the other cases where we

have found a retained interest, she needed that money because she had transferred nearly everything she owned into the FLPs. Her relationship to her assets didn't change after she transferred them to the FLP accounts--and remained the same even after the private annuity sale.

We therefore find that, after transferring the assets into the FLPs, Thelma retained an interest in them in violation of section 2036(a)(1). Well, almost. Because she transferred the FLP interests to her children through the private annuity--albeit in a transfer we have found problematic under section 2036(a)(1) itself--it is possible that she severed her ties to the FLP interests and didn't hold the impermissible retained interest at death. This is where section 2035(a) comes into play. Section 2035(a) says:

> SEC. 2035(a). Inclusion of Certain Property in Gross Estate.--If--
>
> > (1) the decedent made a transfer (by trust or otherwise) of an interest in any property, or relinquished a power with respect to any property, during the 3-year period ending on the date of the decedent's death, and
> >
> > (2) the value of such property (or an interest therein) would have been included in the decedent's gross estate under section 2036, 2037, 2038, or 2042 if such transferred interest or relinquished power had been retained by the decedent on the date of his death, the value of the gross estate shall include the value of any property (or

interest therein) which would have been so included.

Section 2035(a), together with section 2036(a)(1), thus also requires the estate to include the value of assets Thelma transferred to the FLPs, assuming she severed her connection to the FLPs with the sale of her interests to the private annuity. Of course, those assets are already included because of the problems with the private annuity. We hold, therefore, that the Hurfords were not entitled to any discounts because of the FLPs when they calculated the amount of the monthly annuity payments, and so no discounts apply when determining the amount now includable in the estate.[21]

C. The Family and Marital Trusts

We have already described how the Marital and Family Trust account statements show that Thelma moved those accounts into the HI-1 partnership and then tried to shuttle them to her children through the private annuity. At trial, Garza described what happened to the two trusts as follows:

> Well, the accounts were transferred by the
> bank to the limited partnerships, so those
> trusts became assets--the assets in the trusts
> were transferred to the limited partnerships.
> The limited partnership interests were sold to
> the private annuity. See, in effect, you had
> a distribution to Thelma, then a conveyance to

---

[21] The Commissioner also argues that section 2036(a)(2) or section 2038(a)(1) requires inclusion in the estate of the assets transferred into the FLPs. We need not address this argument, because we've found section 2036(a)(1), in conjunction with section 2035(a), suffices.

> the partnership, then a sale of the
> partnership interest to the kids, using the
> private annuity.

Later, when asked whether Thelma had an interest in the Marital and Family Trusts at death, Garza responded: "Well, the assets had been blown out to limited partnerships which had been sold, so I think there were trusts, but I don't think they--I think they were pretty hollow at that point."

On this narrow point, we agree with Garza. The Family Trust was an entirely legitimate part of Gary's estate plan, intended to use his unified credit of $650,000. Bisignano had carefully ensured that the terms of the Family Trust imposed an ascertainable standard on withdrawals--Thelma was limited to taking distributions for her "health, education, support, or maintenance." Without this limitation, the Code would treat Thelma as if she had general power of appointment,[22] and section 2041(a)(2) would include property subject to that power in Thelma's gross estate. But the Hurfords cannot qualify for the exception merely by stating it in the will and avoiding it in practice. Thelma exercised a general power by "distributing" all of the Family Trust to herself and "selling" those assets in the

---

[22] A general power of appointment is one that is "exercis-able in favor of the decedent, [her] estate, [her] creditors, or the creditors of [her] estate." Sec. 2041(b)(1). Any control limited by the ascertainable standard (as was provided by Gary's Family Trust), however, "shall not be deemed a general power of appointment." Sec. 2041(b)(1)(A).

private-annuity agreement, and so they became subject to her full control and individual ownership.[23]  Since Thelma used all the Family Trust's assets as her own in the private annuity, we disregard the fact that they at one time could have been sheltered from any estate tax under the plan designed by Bisignano.

There are many other problems with the Marital Trust's assets independent of the FLP and private-annuity transactions. For example, though Gary's will passed all of the property in his estate--except for the Family Trust's assets, his home, and his personal effects--into the Marital Trust, only a small portion of it ended up in the Marital Trust account with Chase or was otherwise titled in the Trust's name.  And Gary's estate took a QTIP election for approximately $6,500,000.  Were we to try to construct an alternate holding for this part of Thelma's estate, as the Commissioner urges, we would quickly run into tricky questions of whether Thelma's handling of that property was a conversion and disposition of the QTIP property under sections 2511 and 2519.[24]  We'll leave those questions for another case,

---

[23] Sec. 2031(a) broadly provides that the gross estate includes "all property, real or personal, tangible or intangible, wherever situated."

[24]  For example, does a transfer of QTIP into a FLP terminate the qualified income interest that the Code requires Thelma to have from the time she receives the interest until death? Sec. 2044; sec. 25.2519-1(f), Gift Tax Regs.

and hold instead that all the property that Garza moved from Thelma and the Trusts into the FLPs and the private annuity is included without discount in her gross estate under section 2031(a)'s broad language including in an estate "all property, real or personal, tangible or intangible, wherever situated."

D.   Gifts Thelma Made in February 2000

Thelma gave away $675,000 in taxable gifts in February 2000 and reported them on her gift tax return for that year (Form 709).  The Code requires a taxpayer to include adjusted taxable gifts made during life in the computation of the tentative estate tax.  Sec. 2001(b)(1).  The Code then reduces that amount by the hypothetical tax on a taxpayer's post-1976 taxable gifts.  Sec. 2001(b)(2).  The effect is that the estate uses a higher marginal rate on the graduated rate schedule when computing the estate tax.  The Commissioner argues that because Thelma's estate failed to report post-1976 adjusted taxable gifts on her estate tax return, the estate miscalculated the estate tax due.  We agree with the Commissioner.

II. Attorney's Fees

The Commissioner challenges the estate's deduction of $45,000 for attorney's fees it claims it paid Garza to administer Thelma's estate.  Section 2053(a)(2) allows a deduction for administration expenses, including attorney's fees.  See sec.

20.2053-3(a), Estate Tax Regs.  It is the estate's burden to substantiate the deduction.  See Rule 142.[25]

The Commissioner agrees with the Hurfords that they paid Garza over $300,000, so we find it a bit hard to believe that they cannot show any of these fees were paid to administer Thelma's estate.  Garza never complained that the Hurfords failed to pay a bill and we are quite sure that his work on Thelma's estate was not done *pro bono*.

Still, the record is thin.  At trial, the Commissioner cross-examined the Hurfords and Garza, trying to figure out how much of Garza's fees were paid by the estate itself.  But Garza's bills were as sloppy as his other paperwork, and no one was able to decipher them.  The Commissioner asked Michelle how much the estate's administration fee was:

Q.   Do you know what the total fees, estate-tax fees, were paid to Garza Staples?

A.   Well, $45,000 were paid on behalf of my mother's estate.

Q.   Were there fees paid after the estate tax return for your father's estate was filed that were paid to Garza Staples?

A.   Yes.  There was $15,000 paid in the year 2000.

Q.   And is that amount claimed on the 706?

---

[25] Section 7491 shifts the burden of proof to the Commissioner when the taxpayer has produced credible evidence.  However, the Hurfords' lawyers withdrew their section 7491 motion, so Rule 142 applies.

A.    No.

We find Michelle credible and, by a bare preponderance of the evidence, find that the estate has proved its $45,000 deduction for attorney's fees.

III.    Negligence

The estate contests the Commissioner's assertion of a negligence penalty under section 6662.  Before determining the estate's liability, we first have to decide whose negligence matters--Thelma's or her executor's.  On this point, both parties agree that it is Michael's actions that we need to consider, because the estate is the taxpayer and Michael acted as the estate's fiduciary in his capacity as executor.  We agree that this makes his conduct the focus of our analysis of whether a negligence penalty under section 6662 is justified.  See Estate of Holland v. Commissioner, T.C. Memo. 1997-302; see also, e.g., Bank of the West v. Commissioner, 93 T.C. 462, 472 (1989) (imposing on estate's fiduciary a negligence-based penalty for failure to timely file); Thomas v. Commissioner, T.C. Memo. 2001-225 (same).

Since the facts of this case span a long period, we also need to determine when to scrutinize Michael's conduct.  On this, the Code and regulations direct us to use the time period encompassing the preparation of the return at issue, because the "term 'negligence' includes any failure to make a reasonable

attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care *in the preparation of a tax return*." Sec. 1.6662-3(b)(1), Income Tax Regs. (emphasis added). We will therefore consider the time during which Garza and Turner & Stone prepared Thelma's estate's tax returns. Both Garza and Turner & Stone represented the estate during this time and prepared the estate tax return that Michael signed. We consider Michael's knowledge and observations of his attorney's and accountants' actions to decide whether the estate is liable.

The penalty in this case is triggered by a failure to "make a reasonable attempt to comply" with internal revenue laws or to "exercise ordinary and reasonable care in the preparation of a tax return." Sec. 1.6662-3(b)(1), Income Tax Regs. Negligence also includes "failure by the taxpayer to keep adequate books and records or to substantiate items properly." Id. Negligence is "strongly indicated" where the taxpayer "fails to make a reasonable attempt to ascertain the correctness of a deduction, credit, or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances." Id.

If Michael had prepared the estate tax return himself, there is little doubt that we could find negligence or an intentional

disregard of the tax rules.  But Michael himself didn't prepare the returns.  Instead, he hired Garza and Turner & Stone.

The negligence penalty can be rebutted by a showing of reasonable cause and good faith.  Sec. 6664(c).  And Michael points to his reliance on professional advice for proof.  We begin with the regulation, which somewhat unhelpfully states that reliance on professional advice is "reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith."  Sec. 1.6664-4(b)(1), Income Tax Regs.  The caselaw more helpfully points to three factors to test whether the taxpayer--and remember that in this case, that means Michael--properly relied on professional advice.  Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002).

- First, was the adviser a competent professional who had sufficient expertise to justify reliance?

- Second, did the taxpayer provide necessary and accurate information to the adviser?

- Third, did the taxpayer actually rely in good faith on the adviser's judgment? Id.

Both Garza and Turner & Stone were professionally licensed and would have appeared competent to a layman at the time they prepared the estate tax return.  Reliance on even these professionals appears more rational in light of Bisignano's prior recommendations.  Although nowhere nearly as aggressive, and

certainly more competently drafted, Bisignano's advice contained strategies similar in name and purpose to Garza's. Garza was thus not the first to introduce Michael to the concept of family limited partnerships, and we do not find Michael to have unreasonably relied on Garza when pursuing tax-reduction strategies on behalf of his mother's estate. See Melnik v. Commissioner, T.C. Memo. 2006-25. We find it more likely than not that Michael was reasonable in not knowing that Garza's particular method of estate planning was so far off the mark that it would lead him and his family into their present morass of litigation. We find little indication that Michael knew or reasonably could have known that Garza's schemes were not within the realm of legitimate estate-planning practices or that Garza or Turner & Stone lacked sufficient competence in estate-tax law. Sec. 1.6664-4(c), Income Tax Regs.

On the second point, we find that Michael provided both Garza and Turner & Stone with all the relevant financial data needed to assess the correct level of estate tax. Sec. 1.6664-4(c)(1)(i), Income Tax Regs.

It's the third point--did Michael reasonably and in good faith rely on Garza and Turner & Stone's professional advice-- that's the hardest to address. Sec. 6664(c). The regulations direct us to consider "all facts and circumstances" to decide whether Michael's reliance was reasonable and in good faith.

Sec. 1.6664-4(c)(1), Income Tax Regs.  Michael is a child psychiatrist of considerable education and experience in his field, but we find that he is not sophisticated in tax and business matters.  See Malone v. Commissioner, T.C. Memo. 2005-69; cf. Estate of Holland, T.C. Memo. 1997-302 (imposing a negligence penalty on executor who was estate-planning and tax attorney).

Our review of Michelle's notes of meetings and calls with her brother, Garza, and the accountants consistently show a family that wanted to do all it could to reduce or eliminate the tax bill they faced, but also show constant questioning of their advisors about what was going on and whether it would work.  This makes us fall back on United States v. Boyle, 469 U.S. 241 (1985), where the Court noted:

> Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney.  To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. * * * "Ordinary business care and prudence" do not demand such actions.

Id. at 251; see also Chamberlain v. Commissioner, 66 F.3d 729, 733 (5th Cir. 1995), (quoting Boyle) affg. in part, revg. in part, T.C. Memo. 1994-228; Stanford v. Commissioner, 152 F.3d 450, 461-62 (5th Cir. 1998), (discussing the need for even an

intelligent person to obtain expert advice) affg. in part and vacating in part, 108 T.C. 344 (1997).

We consider it well established that a taxpayer has the right to minimize his tax liability, and it was reasonable for Michael to have relied on professionals in the arcane and complex field of estate-tax law. That his and his family's choice of advisers proved so unsuitable has led them to their present situation--unable to enjoy fully the estate built up by old Mr. Hurford, and seeking relief at court instead. But we do find that Michael's reliance on the professionals he chose, however unsuitable they turned out to be, was nevertheless under the circumstances done reasonably and in good faith. We therefore impose no penalty for negligence or disregard of the Code.

Decisions will be entered under Rule 155.